COLONIAL PENN LIFE INSURANCE COMPANY, Plaintiff–Appellee,

v.

HALLMARK INSURANCE ADMINISTRATORS, INCORPORATED, Defendant–Appellant.

No. 93–3090.

United States Court of Appeals, Seventh Circuit.

Argued April 13, 1994.

Decided July 28, 1994.

David L. Doyle (argued), Brian J. Williams, Pope, Cahill & Devine, Chicago, IL, for plaintiff-appellee.

Phillip Fertik, Herbert Beigel (argued), Leigh R. Lasky, Douglas W. Lohmar, Jr., Beigel, Schy, Lasky, Cohen, Rifkind & Hennessey, Chicago, IL, for defendant-appellant.

Before BAUER, WOOD, Jr. and CUDAHY, Circuit Judges.

CUDAHY, Circuit Judge.

In 1986 a company called the Markman Group wanted to sell a new type of major medical insurance policy. Daniel Kubik, an insurance consultant, approached Colonial Penn Life Insurance with a proposition: Colonial Penn could issue and underwrite the policy, which would be sold by Markman (through its existing sales agents), and serviced by Hallmark Insurance Administrators, a company that Kubik would set up with Colonial's financial support.

After some hesitation, Colonial Penn agreed, and the parties entered into a series of contracts setting out this relationship. Kubik formed Hallmark Insurance Administrators, with a $1.5 million loan from the Harris Hinsdale Bank that Colonial Penn guaranteed. Colonial Penn received from Kubik an option to buy Hallmark stock. Finally, Markman agreed to sell, and Hallmark agreed to administer, the new insurance policy.

But after a short period Colonial Penn, acting on the instructions of its parent company, backed out of the deal. Hallmark sued Colonial Penn for breach of contract, and the jury returned a $2.5 million verdict, purportedly representing the profits that Hallmark would have made had Colonial Penn honored its contractual duty to offer the policy.

Colonial Penn appealed, arguing that under the contract it was permitted—not obligated—to offer and underwrite the policy. But we affirmed the jury's verdict, finding that the contractual language was ambiguous, and that the jury was correctly instructed to award damages only if it found that the parties intended to require Colonial Penn to offer and underwrite the policy. *Hallmark Ins. Administrators v. Colonial Penn*, 990 F.2d 984 (7th Cir.1993).

In the meantime, Hallmark had also defaulted on its $1.5 million bank loan. As guarantor, Colonial Penn would have been liable for this amount, but it entered into an agreement with the bank (undisclosed to Hallmark) that would defer its obligation on the guaranty for three years.

Colonial Penn, after the passage of three years, made good on the guaranty, and on doing so was subrogated to the bank's rights to sue Hallmark on the underlying note.[1] In this action (over which there is diversity jurisdiction), Colonial Penn is doing exactly that (alternatively Colonial's Penn claim can be seen as an action for reimbursement on the guaranty [2]). Hallmark responded to Colonial's suit by claiming the matter was res judicata by virtue of the previous action. The district court rejected that defense, and entered summary judgment in favor of Colonial Penn for the $1.5 million, plus fees and interest. Hallmark appeals, contending primarily that Colonial Penn's action is barred by res judicata, but additionally arguing that it is not liable, under its contract with Colo-

nial Penn, for the $1.5 million; and that the court improperly awarded fees and interest to Colonial Penn. We examine each of these arguments in turn.

I

A

Hallmark argues that Colonial Penn's suit on the guaranty arises out of the same transaction as Hallmark's breach of contract action, and is therefore res judicata. We have previously observed that the law of res judicata is "not as clear as it might be," and lamented that in this important area of law it is most unsatisfying to rely—as the cases and commentators tell us to—on "pragmatism" and fuzzy lines such as whether the parties would have expected the cases to have been tried as a unit. *Herrmann v. Cencom Cable Assoc., Inc.*, 999 F.2d 223, 226 (7th Cir.1993). While the traditional formulation is that a claim is barred by res judicata if it emerges from the same "core of operative facts" as a previously litigated matter, *see generally, In the Matter of Energy Cooperative Inc.*, 814 F.2d 1226, 1230–31 (7th Cir.), *cert. denied*, 484 U.S. 928, 108 S.Ct. 294, 98 L.Ed.2d 254 (1987), we have recently, attempting to draw a brighter line, suggested that "two claims are one for the purposes of res judicata if they are based on the same, or nearly the same, factual allegations." *Herrmann*, 999 F.2d at 226.

The two claims before us do not arise out of the same factual allegations. In the first litigation, Hallmark alleged that Colonial breached the Administrator Agreement, under which Colonial promised to issue and underwrite, and Hallmark promised to administer, the new policy. Colonial Penn, in its counterclaim (which—on this point—sought only an accounting), alleged that Hall-

---

1. *See* 83 C.J.S. *Subrogation* § 59 (1953) ("A surety or guarantor who pays a bill or note will be subrogated to all rights and remedies which were available to the holder or owner of the instrument to obtain payment thereof."); *Holyoke v. Continental Ill. Nat'l Bank & Trust Co.*, 346 Ill. App. 284, 104 N.E.2d 838 (1952).

2. *See* 38 C.J.S. *Guaranty* § 111 (1943) ("Where a guarantor, who has entered into a contract of

guaranty at the request of, or with the consent of, the principal obligor, pays or is compelled to pay his principal's debt, the law raises an implied promise, unless there is an express one, on the part of the principal to reimburse the guarantor, and on the payment of the debt the guarantor at once has a right of action against the principal for reimbursement of the amount which he has paid."); *King v. Hannah*, 6 Ill.App. 495 (1880).

mark breached the Guaranty Agreement by withdrawing the last $500,000 from the bank loan fund after learning that Colonial Penn would no longer offer the insurance policy. R.O.A. 20, Exh. H, ¶ 18. There was no allegation that Hallmark defaulted on the loan or that Colonial Penn paid on the guaranty. In sum, none of the facts alleged would give rise to an action by Colonial Penn against Hallmark for the amount of the loan. In the present litigation, Colonial Penn alleges that Hallmark defaulted on the bank loan, and that it was forced to make good on the guaranty. R.O.A. 1, ¶¶ 14–20. Because this claim is not "based on the same, or nearly the same, factual allegations" as the previous litigation, it is not barred by res judicata. *Herrmann,* 999 F.2d at 226.

### B

█ Hallmark also advances the related argument that Colonial Penn's claim against it on the guaranty was a compulsory counterclaim under Fed.R.Civ.P. 13(a), which requires a defendant to plead any counterclaim that "arises out of the transaction or occurrence" that forms the basis of the plaintiff's claim. On that issue we find the opinion in *Valencia v. Anderson Brothers Ford,* 617 F.2d 1278 (7th Cir.1980), instructive. That case involved an automobile loan, made by a dealer, that was found to violate the Truth in Lending Act, 15 U.S.C. § 1601 *et seq.* We held that a lender's suit on a loan was not a compulsory counterclaim to the borrower's suit for damages under the Act. Though as a linguistic matter the claims might arguably have been said to come out of the same "transaction"—the loan agreement—the relationship between the claims lacked the necessary "logical relationship" to make the counterclaim compulsory. *Id.* at 1291.

The same is true here, except in this case, unlike in *Valencia,* the two claims do not even emerge from the same document. The nub of Hallmark's suit against Colonial Penn was Colonial Penn's agreement to issue and underwrite the policy, embodied in the Administration Agreement. That issue bears no logical relationship with the claim here, which can be seen either as an action to assert the bank's rights to which Colonial

Penn had been subrogated, or alternatively as a claim for reimbursement. The fact that Colonial Penn had no cause of action against Hallmark for the $1.5 million until it paid on the guaranty makes it obvious that Colonial Penn's claim against Hallmark did not—for the purposes of Rule 13(a)—arise out of the same "transaction" as Hallmark's claim against Colonial Penn. *See also Burlington Northern R. Co. v. Strong,* 907 F.2d 707, 711–12 (7th Cir.1990); *Gilldorn Sav. Ass'n v. Commerce Sav. Ass'n,* 804 F.2d 390, 396 (7th Cir.1986). And in any case, this circuit's formulation of the "logical relationship" test has been described (and praised) as a "narrow" one, that perhaps asks little more than whether the plaintiff's claims would be barred by res judicata. *See* Comment, *Narrowing the Scope of Rule 13(a),* 60 U.Chi. L.Rev. 141 (1993). If, in fact, our test for determining whether a counterclaim is compulsory is simply to ask whether the claim would also be barred by res judicata, then Hallmark's argument that Colonial Penn's claim was a compulsory counterclaim would add nothing to its argument that the claim was barred by res judicata. But it is in any event clear to us that there is no "logical relationship" between the claims, so Colonial Penn's claim in the present litigation was not a compulsory counterclaim to Hallmark's claim in the previous action.

### C

█ Intermingled with its argument that Colonial Penn was required to bring this claim earlier, Hallmark insists that Colonial Penn in fact litigated this issue in the previous lawsuit, and must not be permitted to bring the claim again. The heart of this argument is that in the first lawsuit Colonial Penn listed, in a pretrial memorandum, "$1.5 million Harris Bank—Hinsdale Bank loan" as "special damages" on its counterclaim. R.O.A. 20, Exh. I, ¶ 1. Hallmark thus contends that Colonial Penn knew that it was going to have to make good on its guaranty, and had already brought suit to recover that amount. Colonial Penn responds by saying that this item of damages was meant to approximate the injury it had suffered by virtue of Kubik and Hallmark's breach of the

Guaranty Agreement—their failure to devote their energies to the business of Colonial Penn—and not a claim on the guaranty itself.

This explanation makes little sense to us, as a matter either of economics or of common sense. If the point of these "special damages" was to argue that these funds were to have been used to further the joint insurance venture, and that had Hallmark not breached its contract (by failing to devote its energies to the business), the business would have succeeded and Colonial Penn would not have had to pay on the guaranty, it would be possible to argue that the matter had been litigated. But because Colonial Penn had not yet paid on the guaranty, such an argument should not have yet been available. And Hallmark, by the same token, argued to the jury in the previous lawsuit that it still owed the bank $1.5 million, and that an award of that amount would leave Hallmark with nothing. R.O.A. 9, Exh. C ("Hallmark owes $1.5 million to the Harris Bank, if you award $1.5 million, it is zero."). And Kubik testified at trial as follows:

> Q: Now, on this $1,500,000 bank loan, Hallmark, if I understand your testimony, your answers to Mr. Doyle's questions, it is your view that Hallmark owes that money?
>
> A: Yes.
>
> Q: So if Hallmark gets some money, it has got to pay the bank that one million five?
>
> A: Yes.

We fail to understand what the $1.5 million had to do with the previous suit. It should not have been relevant to the calculation of Hallmark's damages, which ought to have been measured by subtracting the costs Hallmark avoided, from the revenues it lost, on account of Colonial Penn's breach. All we can conclude from the various inconsistent references is that there is some confusion about the role the $1.5 million loan played in the previous litigation. Neither res judicata nor collateral estoppel turns on whether evidence that bore no relation to the claims being asserted was somehow introduced or referenced in a previous litigation. Without getting into the morass of what damages were listed in pretrial motions, what evidence was introduced at trial and what arguments were made to the jury, we think it is sufficient to note that Colonial Penn's claim here does not arise out of factual allegations that were (or are even similar to those that were) made in the pleadings in the previous litigation. It therefore cannot be argued that this matter was "actually litigated" in the previous action. Neither res judicata (claim preclusion) nor collateral estoppel (issue preclusion) bars this suit.

### D

Hallmark argues that our conclusion allows Colonial Penn to jimmy the doctrine of res judicata to its liking. It insists that Colonial Penn ought not be permitted, by entering into the deferral agreement with the bank, to avoid the application of res judicata. At the very least, Hallmark contends, a reasonable jury might find that this is what Colonial Penn was trying to do.

First of all, Hallmark's argument presupposes the existence of a doctrine—one for which it cites no relevant authority—that parties are not to be permitted to arrange their affairs in order to take advantage of the doctrine of res judicata. But whether or not the law embraces such a principle (a question we do not here have occasion to entertain), it would have no application to this case. Our conclusion that the action for reimbursement on the guaranty (or to enforce the note) is separated by the measure of res judicata from Hallmark's breach of contract action renders the deferral agreement irrelevant for res judicata purposes. Even if Colonial Penn's action were ripe when Hallmark brought its contract action (and that is also the implication of Hallmark's argument that Colonial Penn in effect "paid" on the guaranty by entering into the deferral agreement), it had no obligation to bring its claim in the same litigation. Colonial Penn's alleged contrivance—which at most pushed back the date on which its claim against Hallmark accrued—is irrelevant to the res judicata question.

### II

Hallmark also argues that its agreement with Colonial Penn provided that, in

the event Colonial Penn were required to pay on the guaranty, Colonial Penn's remedies against Hallmark would be limited to offsetting the amount paid on the guaranty from the stock purchase price, should Colonial Penn exercise its option to purchase Hallmark stock. In an affidavit, Kubik testified that as he understood the deal, if Colonial Penn were required to pay on the guaranty, its "exclusive recourse would be to offset that amount, plus interest at the agreed prime rate, against the ultimate purchase of Hallmark, if and when Colonial executed the Stock Option Agreement." R.O.A. 65, Exh. 1, p. 2.

In support of this interpretation Hallmark points to the language of the stock option agreement that provides, if Colonial Penn "pays any portion of the outstanding balance of the Loan to the lender or of any other debts or obligations of [Hallmark], such amount, plus interest thereon at the prime rate announced by Harris Bank Hinsdale N.A. from time to time, shall be set-off first against the purchase price of the Stock and then, if necessary, against the additional purchase price to be paid by Kubik." R.O.A. 65, Exh. 3, p. 3.

The magistrate found—and the district court agreed—that the stock option agreement spelled only out the terms and conditions of the stock purchase, in the event Colonial Penn exercised that option. It did not, however, purport to limit Colonial Penn's other remedies against Hallmark should Colonial Penn be required to pay on the guaranty.

We agree that the contract is unambiguous, and that it means exactly what the magistrate and district court said it means. Nothing in the contract purported to deprive Colonial Penn of its common law right, as guarantor, to seek reimbursement on the guaranty, or otherwise suggest that the offset against the stock purchase price would be an exclusive remedy. *See* 83 C.J.S. *Subrogation* § 51 (1953) ("A surety may waive his rights as subrogee by express agreement [but the] act relied on as a waiver must actually be inconsistent with the enforcement of the creditor's rights by way of subrogation."). The stock option agreement simply

does not speak of Colonial Penn's rights as guarantor or subrogee. It is true that Kubik's affidavit argues to the contrary, but because we see no contractual language that can even arguably be read to limit Colonial Penn's remedies in the way Kubik contends, his affidavit does not give rise to a material issue of fact about the interpretation of the contract.

Hallmark insists that this conclusion is brought into doubt by the facts that (1) the various contracts among the several parties were "interrelated" and (2) Hallmark gave Colonial Penn perfected security interests in the assets and stock of Hallmark. To avoid summary judgment, the nonmoving party must show a genuine issue of *material* fact. Whatever Hallmark's evidence shows, it does nothing to suggest that the stock option agreement abrogated Colonial Penn's common law action in reimbursement, by providing that the offset to the stock purchase price would represent Colonial Penn's *exclusive* remedy against Hallmark, should Hallmark fail to pay on the note. Because Hallmark puts forward no evidence raising a genuine issue of material fact, the district court correctly entered summary judgment in Colonial Penn's favor.

### III

■ Finally, Hallmark objects to the district court's award of interest and attorneys' fees to Colonial Penn. Specifically, Hallmark argues that had Colonial Penn brought this action as a counterclaim in Hallmark's initial suit, its attorneys fees would have been lower. Therefore, the principle that an injured party has a duty to mitigate damages required it to do so. And having failed to do that, it cannot now recover the additional damages that it suffered (or attorneys' fees expended) as a result.

■ Colonial Penn's claim for attorneys' fees is grounded in the note, which permits the bank to recover from the borrower whatever attorneys' fees it might incur in a legal action to collect on the note. R.O.A. 14, Exh. A, p. 2. It is true that Colonial Penn has a duty to mitigate damages, but that means only that Colonial Penn's recovery of attor-

neys' fees is limited to "reasonable" costs incurred. Perhaps Colonial Penn's fees would have been less had it promptly paid on the debt and brought this cause of action as a counterclaim in the previous litigation. But there are legitimate reasons why it might not have wanted to do so. Primarily, it might have thought that Hallmark, after receiving the judgment in the first litigation, would pay its debt and avoid the necessity of litigating this issue at all. Colonial Penn's attorneys' fees therefore cannot be described as unreasonable, and we do not find the court's award of attorneys' fees otherwise to be erroneous.

■ Hallmark repeats essentially the same argument regarding the award of interest. "Colonial Penn could have avoided all this interest ... by bringing its claim as a counterclaim in *Hallmark I*." Br. at 41. Maybe so, but had it done so, Hallmark would have had to pay out the $1.5 million years sooner. In that case, it would not have been able to use the $1.5 in principal for that period of time, and it is the value of that "use" that is being recovered in the interest payment.

If there is no complaint about the *rate* of interest (and no such complaint is made here), then there is no difference between paying a sum certain without interest on one day, and paying that same sum with interest on some future day. That point is made exceedingly obvious in a case like this one, where the central dispute is over who should pay back the principal on a loan. The point is that Hallmark is required to pay interest on the $1.5 million dating back to 1989 because beginning at that time Hallmark held the principal while Colonial Penn made the interest payments. The district court's judgment just allows Colonial Penn to recoup these expenses—and it forbid Colonial Penn from recovering the higher interest payments it incurred on account of its agreement deferring its obligation to pay on the guaranty. No error was committed.

The district court's judgment is AFFIRMED.