SUPER NATURAL DISTRIBUTORS, INC., Plaintiff,

v.

MUSCLETECH RESEARCH AND DEVELOPMENT, Defendant.

No. 00–C–1361.

United States District Court, E.D. Wisconsin.

May 22, 2001.

Michael A. Bowen, Foley & Lardner, Milwaukee, WI, for Plaintiff.

Howard J. Shire, Joseph F. Nicholson, Gregg A. Paradise, Kenyon & Kenyon, New York City, Kathleen S. Donius, Reinhart, Boerner, VanDeur Norris & Rieselbach, Milwaukee, WI, for Defendant.

## ORDER

STADTMUELLER, Chief Judge.

Currently before the court in this quickly-escalating battle between two formerly-associated businesses is a motion by plaintiff Super Natural Distributors, Inc. ["Super Natural"] to enjoin defendant MuscleTech Research and Development ["MuscleTech"] from pursuing claims against Super Natural in the United States District Court for the Western District of New York.[1] Super Natural contends that allegations raised by Muscle-Tech in a lawsuit filed in that jurisdiction are compulsory counterclaims to the case at bar and should not be permitted to proceed in any other form. While a court certainly is entitled to enter an injunction on this ground, *see generally, Martin v. Graybar Elec. Company,* 266 F.2d 202 (7th Cir.1959), it must first "examine carefully the factual allegations" to determine if the claims raised in the foreign jurisdiction are, indeed, compulsory counterclaims in an already-pending lawsuit, *Burlington Northern R.R. Co. v. Strong,* 907 F.2d 707, 711 (7th Cir.1990). If this inquiry is satisfied, the court must then determine if exercising its discretionary injunctive powers would serve the goals of judicial economy, fairness, and consistency. *See generally, Asset Allocation and Management Co. v. Western Employers Ins. Co.,* 892 F.2d 566 (7th Cir.1989). Both examinations are fact-intensive, and both must favor the movant before an injunction will issue. Prior to addressing the merits of

---

1. Also before the court is MuscleTech's "alternative motion to transfer venue pursuant to 28 U.S.C. § 1404(a)." In the event that the court rules in favor of Super Natural on its motion for injunctive relief, MuscleTech seeks to have the entire lawsuit transferred to the Western District of New York. As the court will not be granting Super Natural the injunction it seeks, MuscleTech's motion will be denied as moot.

the motion, then, the court wishes to set out in some detail the circumstances leading to the present dispute.

## BACKGROUND

Defendant MuscleTech Research and Development is a Canadian manufacturer of a popular line of dietary supplements. Plaintiff Super Natural Distributors, Inc. is a national distributor of health products, including those of MuscleTech. Super Natural, whose physical plant is located in Waukesha, Wisconsin, is a relatively large operation. Last year it sold more than $20 million worth of merchandise to 1400 retailers throughout the United States. Although Super Natural distributes the products of more than 200 vendors, it generated roughly 20% of its year 2000 revenue from MuscleTech-branded goods. Importantly, however, not all of this "MuscleTech" merchandise was obtained directly from the manufacturer. While continuing to place orders with Muscle-Tech, Super Natural contracted with a mysterious off-shore supplier named "M Olympus" to deliver nearly $1 million worth of MuscleTech-branded products to Super Natural's warehouse. These goods, which MuscleTech claims were counterfeit, were purchased at substantially lower prices than those offered by MuscleTech itself.

Super Natural's involvement with M Olympus began in late 1999. At that time, Patricia Calvy, Super Natural's president, complained to MuscleTech's assistant warehouse manager, Kent Mosur, that Costello's, a Chicago-based distributor of MuscleTech product, was receiving lower pricing than she. Mr. Mosur reportedly suggested that Super Natural could obtain even lower prices than Costello's by pur-.

chasing not from MuscleTech directly, but from a Spanish distributor—M Olympus. He claimed M Olympus could offer substantial discounts because MuscleTech had a different pricing scheme for Europe than it did for America. Ms. Calvy e-mailed the purported Spanish entity, and began placing large orders for nutritional supplements ostensibly manufactured by Muscle-Tech and other leading companies. Ms. Calvy never spoke with or personally met any representative of M Olympus.

In January 2000, MuscleTech promoted Mr. Mosur from assistant wholesale manager to international sales manager. Ms. Calvy continued to have contact with him, however, and continued to purchase goods from M Olympus. These goods were sent from warehouses in New York state, and not Spain, as might have been expected.

In the spring of 2000 MuscleTech began receiving customer complaints about the consistency of its products, and commenced an investigation. With the assistance of the Federal Bureau of Investigation ["FBI"], MuscleTech discovered that some of the product sold under its name was, in fact, counterfeit. Continued investigation pointed to Mr. Mosur and two other employees as prime culprits in a wide-ranging scheme to sell counterfeit, as well as stolen, MuscleTech merchandise. When confronted on June 22, 2000, Mr. Mosur reportedly admitted that he arranged for counterfeit MuscleTech product to be delivered to several distributors. He did not mention Super Natural as being one of those distributors, however.

On June 29, 2000, MuscleTech informed Ms. Calvy that Mr. Mosur had been fired for suspected counterfeiting of Muscle-Tech merchandise.[2] She did not inform

---

**2.** Actually, it was unclear to the court from Ms. Calvy's testimony at the January 17, 2001, preliminary injunction hearing whether she learned the reason for Mr. Mosur's termination during her June 29 conversation with

MuscleTech representative Terry Begley, or immediately afterward when she called Mr. Mosur personally. In either case, she knew

the company that she had purchased goods from a source arranged by Mr. Mosur, though, or that she suspected some of those goods—purported "Cytodyne" products—to be counterfeit. Instead, she continued to sell from inventory the merchandise she obtained from M Olympus. Super Natural placed all its ensuing orders for MuscleTech products directly with the company, however.

On August 28, 2000, MuscleTech filed a complaint in the United States District Court for the Western District of New York against Mr. Mosur, the distributors he identified as selling counterfeit goods, and a small handful of individuals alleged to have participated in the counterfeiting ring ["the New York action"]. This complaint sought legal and equitable relief for alleged acts of trademark and trade name counterfeiting and infringement, false designation of origin and misrepresentation in commerce, copyright infringement, violations of the Racketeer Influenced and Corrupt Organizations Act, conversion, consumer fraud, and unfair competition. During discovery for a preliminary injunction in the New York action MuscleTech apparently learned of M Olympus's existence and of Super Natural's purchases from the "distributor." MuscleTech determined that M Olympus was but a thinly-veiled front for Mr. Mosur himself.

By the middle of September, MuscleTech's executive vice president Terry Begley began to believe that Super Natural itself had been involved in the counterfeiting operation. In a taped conversation on September 18, 2000, he informed Ms. Calvy that the FBI was investigating the counterfeiting of MuscleTech product. He then asked Ms. Calvy immediately to deliver to him all her records related to Super Natural's dealings with M Olympus. Within days, she provided most of the requested documents. Roughly one week

later, MuscleTech amended its complaint in the New York action. It did not add Super Natural as a defendant.

In spite of Ms. Calvy's apparent cooperation with the ongoing MuscleTech investigation, on October 2, 2000, an expected delivery of MuscleTech merchandise failed to arrive at Super Natural's Waukesha warehouse. Ms. Calvy was told that the delay was due to a credit limit problem. Shortly thereafter, she wired MuscleTech $147,000 to cover a separate invoice that was not yet due. The merchandise still did not arrive—despite the fact Super Natural was now well below its credit limit. On October 12, 2000, MuscleTech's new assistant warehouse manager, Dean Pipher, informed Ms. Calvy that MuscleTech would not be delivering the order because it suspected Super Natural of collaborating with Mr. Mosur in the manufacture and distribution of counterfeit MuscleTech products. She was told that all further shipments would be suspended pending investigation. The very next day, Super Natural instituted the present lawsuit in Waukesha County Circuit Court, claiming that it was a "dealer" under the Wisconsin Fair Dealership Law ["WFDL"] and that its dealership had been effectively—and illegally—terminated. Specifically, Super Natural claimed that MuscleTech did not have good cause to suspend shipments, that MuscleTech failed to provide a 90 day notice of termination, that MuscleTech failed to specify in writing the asserted grounds for the action, and that MuscleTech failed to provide Super Natural with 60 days in which to cure any claimed deficiency, all in violation of the WFDL.

Invoking the court's diversity jurisdiction, MuscleTech immediately removed to this court. The companies then agreed temporarily to resume shipments, subject to MuscleTech's intent to send a written

of Mr. Mosur's suspected counterfeiting in late June, 2000.

termination notice. On October 25, 2000, the anticipated notice arrived. This notice indicated that final termination would occur in sixty days (later extended an additional 40 days) and was based on 1) Super Natural's alleged participation in a counterfeiting ring, 2) Super Natural's failure to follow MuscleTech directives, 3) Super Natural's "misrepresentations" about its purchase of "counterfeit products," 4) Super Natural's "poor payment history," and 5) Super Natural's withholding of information related to its purchases of goods from M Olympus. The only cure offered was that if Super Natural could "restore MuscleTech's trust" within sixty days, termination would be rescinded.

MuscleTech answered Super Natural's complaint on November 6, 2000. In that answer, MuscleTech claimed that the MuscleTech—Super Natural relationship was never a "dealership" and therefore Super Natural was not entitled to the protections of the WFDL. In the alternative, MuscleTech argued that Super Natural's behavior so "dirtied" its hands that it should be barred from seeking equitable relief in federal court. In a final argument, MuscleTech addressed the merits of the WFDL claim, contending that it had good cause to terminate Super Natural and that Super Natural's behavior was so egregious that it was "uncurable."

As Super Natural sought a preliminary injunction forcing MuscleTech to continue providing it with merchandise, the court held a hearing on January 17, 2001. In a written opinion dated February 6, 2001, the court found that Super Natural's "chance of success on the merits in proving the existence of a 'dealership' protected by the WFDL ... is significantly less than 50%." Case No. 00–CV–1361, Slip Op. at 18 (E.D.Wis. Feb. 6, 2001). As a result, the court denied Super Natural the injunctive relief it sought and MuscleTech stopped delivering merchandise to the company.

While awaiting the court's ruling on the preliminary injunction, MuscleTech filed a second amended complaint in the New York action. In that complaint, dated January 29, 2001, MuscleTech named Super Natural as an additional defendant, claiming that Super Natural was a "knowing and wilful distributor of counterfeit products for the conspiracy." The complaint alleges that Super Natural's actions violated the Racketeer Influenced and Corrupt Organizations Act, and may result in direct or indirect liability for trafficking in counterfeit goods (18 U.S.C. § 2320), criminal copyright infringement (17 U.S.C. § 506 and 18 U.S.C. § 2319), mail and wire fraud (18 U.S.C. §§ 1341 and 1343), transportation in interstate and foreign commerce of stolen goods (18 U.S.C. § 2314), sale of stolen goods (18 U.S.C. § 2315), theft from interstate shipments (18 U.S.C. § 659), interstate and foreign travel or transportation in aid of a racketeering enterprise (18 U.S.C. § 1952), laundering of money instruments (18 U.S.C. § 1956), engaging in monetary transactions in property derived from specified unlawful activity (18 U.S.C. § 1957), and bribery (N.Y. Penal Law §§ 180.03 and 180.08). The complaint also raises allegations of trademark infringement in violation of 15 U.S.C. § 1114(a), false designation of origin in violation of 15 U.S.C. § 1125(a), unfair competition in violation of New York General Business Law § 349, deceptive trade practices in violation of New York General Business Law § 349, and common law conversion. As a result of these new allegations, three codefendants in the New York action filed cross-claims against Super Natural seeking contribution or indemnity should damages be awarded.

Not to be outdone, Super Natural returned to this court on February 16, 2001,

to amend its own complaint. In its amended complaint, Super Natural alleges that MuscleTech violated the Robinson–Patman Act by offering discriminatory pricing to Costello's, and perhaps to other similarly-situated MuscleTech distributors. Super Natural seeks treble damages for this behavior pursuant to 15 U.S.C. § 15.

At the same time it was amending its complaint, Super Natural moved to bar its involvement in the New York action by filing with this court a motion titled, "motion to enjoin defendant's prosecution in another court of a claim that is a compulsory counterclaim in the present action." Five days later Super Natural filed motions to the same effect in the United States District Court for the Western District of New York, styled, "alternative motions to dismiss or stay proceedings on plaintiffs' second amended complaint on the grounds that the claims asserted are compulsory counterclaims in a prior pending action." Super Natural also filed motions to dismiss the cross-claims on the ground that venue is inappropriate in New York (once again for compulsory counterclaim reasons).

The motion before this court to enjoin prosecution of the New York action is now fully briefed, as are the sister motions pending in New York. Having carefully read the briefs and researched the issues, the court will now rule on the motion before it.

## DISCUSSION

■ Although it "says nothing about injunctions," *Asset Allocation, supra,* 892 F.2d at 572, much of the court's discussion will focus on Federal Rule of Civil Procedure 13(a)—Compulsory Counterclaims. Rule 13(a) states, in relevant part:

A pleading shall state as a compulsory counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction. But the pleader need not state the claim if ... at the time the action was commenced the claim was the subject of another pending action ....

An observant reader will note that the language of this rule is largely hortatory, and does not call for sanctions against a party who does not abide by the rule. Nonetheless, it is well-established that failure to plead a compulsory counterclaim may bar a party from bringing a later independent action on that claim. *See Baker v. Gold Seal Liquors, Inc.,* 417 U.S. 467, 469 n. 1, 94 S.Ct. 2504, 41 L.Ed.2d 243 (1974). The general rule is that a claim that should have been pleaded as a compulsory counterclaim in one suit will be barred in a subsequent action if a responsive pleading was required to be, or was served in the earlier action, and a final judgment was rendered in that suit. *See* 3 James W. Moore, Moore's Federal Practice § 13.14[1] (Daniel R. Coquillette, *et al.,* eds., 3d ed.2001). If a final judgment has *not* been reached in the first suit, the court has discretion to stay or enjoin any subsequent claims, but is not required to do so. *See Asset Allocation,* 892 F.2d at 572 (the power to enjoin subsequent suits "is a power, not a duty")(citing *Warshawsky & Co. v. Arcata National Corp.,* 552 F.2d 1257, 1265 (7th Cir.1977)).

■ Commenting on the history of Rule 13, the United States Supreme Court noted that, "[t]he requirement that counterclaims ... 'shall' be stated in the pleadings was designed to prevent multiplicity of actions[.]" *Southern Constr. Co., Inc. v. Pickard,* 371 U.S. 57, 60, 83 S.Ct. 108, 9 L.Ed.2d 31 (1962). Because counterclaims generally can be adjudicated most effi-

ciently in one action (as Rule 13 envisioned), the presumption is that courts should enjoin prosecution of subsequently-filed lawsuits that state claims characterizable as compulsory counterclaims to the initial action. *See Asset Allocation*, 892 F.2d at 573. As such, the viability of a subsequently-filed claim depends largely on its proper characterization.

In this judicial circuit, whether a claim is a compulsory counterclaim hinges on whether the claim of the defendant (whether asserted in the same case or in a subsequent action) is "logically related" to the claim(s) asserted by the plaintiff. *See Colonial Penn Life Ins. Co. v. Hallmark Ins. Adm'rs, Inc.*, 31 F.3d 445, 448 (7th Cir. 1994). This test derives from language in *Moore v. New York Cotton Exchange*, 270 U.S. 593, 610, 46 S.Ct. 367, 70 L.Ed. 750 (1926), that interpreted the phrase "transaction or occurrence," which appears in both Federal Rule of Civil Procedure 13(a) and its predecessor, Equity Rule 30.

Unfortunately, "logical relationship" is an imprecise phrase with no universally-agreeable meaning. *See Kissell Co. v. Farley*, 417 F.2d 1180, 1183 (7th Cir.1969). *See also Burlington Northern Railroad Company v. Strong*, 907 F.2d 707, 711 (7th Cir.1990)("there is no formalistic test to determine whether suits are logically related"). Thus, courts are encouraged to look to the policies underlying Rule 13(a) to aid them in determining whether a claim should be deemed a compulsory counterclaim. *See Valencia v. Anderson Bros. Ford and Ford Motor Credit Co.*, 617 F.2d 1278, 1291 (7th Cir.1980)(the "test is to be applied flexibly in order to further the policies of the federal rules in general and Rule 13(a) in particular").

The purpose of Rule 13(a) is judicial economy. *See In re: Price*, 42 F.3d 1068, 1073 (7th Cir.1994)(citing 6 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure:

Civil 2d § 1409, at 46–47 (2d ed.1990)). *Accord Southern Constr., supra*, 371 U.S. at 60, 83 S.Ct. 108. To determine whether this purpose is served, a court should consider "the totality of the claims, including the nature of the claims, the legal basis for recovery, the law involved, and the respective factual backgrounds." *In re: Price*, 42 F.3d at 1073 (quoting *Burlington Northern, supra*, 907 F.2d at 711–12).

In the present case, the court does not believe the totality of the circumstances support Super Natural's proposition that the RICO claims asserted by MuscleTech in the New York action are "logically related" to the WFDL claim asserted in this case—though a "wooden application" of the logical relationship label might suggest otherwise. *Cf. Gilldorn Savings Ass'n v. Commerce Savings Ass'n*, 804 F.2d 390, ("wooden application of the common transaction label [may not] yield real judicial economy")(quoting *Valencia*, 617 F.2d at 1291).

In the 1926 case *Moore v. New York Cotton Exchange*, the United States Supreme Court spoke of a compulsory counterclaim as being a claim deriving from "a circumstance without which neither party would have found it necessary to seek relief." 270 U.S. at 610, 46 S.Ct. 367. Super Natural contends that if MuscleTech did not suspect Super Natural of participating in the counterfeiting scheme, it never would have suspended its deliveries of Muscle Tech product and Super Natural never would have sought recourse under the Wisconsin Fair Dealership Law. As suspicion of counterfeiting was a "circumstance without which neither party would have found it necessary to seek relief," Super Natural contends that any counterfeiting claims MuscleTech may have are compulsory counterclaims to the WFDL suit at bar.

There is, of course, a certain intuitive appeal to this argument. It almost goes without saying that if termination of a relationship is based on suspicion of counterfeiting, any subsequent counterfeiting claims are, indeed, "logically related" to a claim seeking to bar that termination. As mentioned above, however, mere semantic "logical relationship" is not the touchstone of the test. *See Valencia*, 617 F.2d 1278, 1291 (refusing to deem a claim a compulsory counterclaim despite an apparent "logical relationship" because "any perceived logical nexus is conceptual, abstract, a formal characterization rather than a recognition of concrete advantage to be achieved through single forum adjudication of all the parties' opposing claims"). Instead, the court's decision is to turn primarily on judicial economy and the "totality of the claims," bases that do not favor Super Natural's position. *See In re: Price*, 42 F.3d at 1073.

The biggest factor leading the court to believe MuscleTech's claims against Super Natural are not properly characterizable as compulsory counterclaims is the lack of a "shared realm of genuine dispute" between this case and the New York action. *Burlington Northern, supra*, 907 F.2d at 712 (quoting *Valencia*, 617 F.2d at 1291). As the Wisconsin Supreme Court has noted, probably the most litigated issue in Wisconsin Fair Dealership Law cases is whether the relationship between litigants was actually a "dealership" as defined by law (and thus whether the WFDL applies at all). *See Ziegler Co., Inc. v. Rexnord, Inc.*, 139 Wis.2d 593, 600 n. 2, 407 N.W.2d 873, 877 n. 2. *Accord* Michael A. Bowen & Brian E. Butler, The Wisconsin Fair Dealership Law, Table of Cases (2nd ed.1999)(listing at least 80 cases addressing the issue). This certainly was the primary question faced at the preliminary injunction stage of these proceedings, and quite likely will be the primary question at the final adjudication stage. *See* Case No. 00–CV–1361, Slip Op. at 18 (E.D.Wis. Feb. 6, 2001)(Super Natural's "chance of success on the merits in proving the existence of a 'dealership' protected by the WFDL . . . is significantly less than 50%").

As the case is presently configured, if the court disposes of Super Natural's WFDL claim on the ground that there is no "dealership" to protect, or on the ground that Super Natural is barred from seeking equitable relief, it need never address MuscleTech's primary reason for suspending shipments—the alleged counterfeiting. In fact, even if the court does find it necessary to address whether MuscleTech had "good cause" to terminate Super Natural's distribution rights, it still may not resolve the counterfeiting issue since MuscleTech's other stated grounds for dismissal—failure to follow company directives, withholding of information, and making of false statements [3]—might, if proven, be sufficient to satisfy the good cause requirements of the WFDL. As it stands, then, the court does not foresee any genuine dispute in this lawsuit over Super Natural's alleged counterfeiting.

Conversely, counterfeiting is *the* primary disputed issue in the New York action. In light of the long-standing claims against parties other than Super Natural, Judge Arcara will need to resolve the counterfeiting issues in that suit whether the court finds MuscleTech's claims against the immediate plaintiff compulsory or not. In fact, due to the cross-claims recently filed against Super Natural, Super Natural itself appears slated to litigate in New York irrespective of the court's decision on the current motion. Thus, the

---

3. MuscleTech no longer seriously contends that Super Natural had a poor payment history, even though that, too, was listed as a ground for termination in the October 25, 2000, letter the company sent.

situation faced by the court is much like that addressed by *Board of Education of Evanston Township High School District No. 202 v. Admiral Heating and Ventilation, Inc.*, 511 F.Supp. 343, 346 (N.D.Ill. 1981), where the judge wrote, "Principles of judicial economy would be disserved by consideration of plaintiff['s] claims (which must be considered) and defendant['s ...] counterclaims in the same trial.... Interjection of defendant['s] counterclaims ... would substantially burden the progress of the litigation and proliferate its issues enormously, without correspondingly reducing the burden the parties would have to bear[.]"

The admonitions of *Admiral Heating* ring especially true in this case: If the court were to address MuscleTech's multitudinous claims against Super Natural as compulsory counterclaims, it would be forced to address the civil RICO statute, the federal trademark statutes, common law unfair competition, and a whole host of other laws that otherwise would play no role in the case—even if the court were to address "good cause" under the WFDL. Indeed, the diverse and wide-ranging nature of the claims asserted in the New York action—touching on parties, facts, law, and evidence otherwise unnecessary for resolution of the present lawsuit—indicate to the court not only that judicial economy would be impaired by their treatment as compulsory counterclaims, but also that the "totality of the claims" are not truly related at all. *See Burlington Northern*, 907 F.2d at 712 ("A court should consider the totality of the claims, including the nature of the claims, the legal basis for recovery, the law involved, and the respective factual backgrounds" when determining whether claims are logically related). *See also, Gilldorn*, 804 F.2d at 397 (refusing to find a defendant's claims compulsory counterclaims because the claims "raise different legal and factual issues governed by different bodies of law")(quot-

ing *Valencia*, 617 F.2d at 1291); *Federman v. Empire Fire and Marine Ins. Co.*, 597 F.2d 798, 812 (2nd Cir.1979)("While it is true that [the defendant's] counterclaims ... bear some factual relationship to the original claim ... it cannot be said that they arise out of the same transaction or occurrence [because they] go far beyond the purview of the plaintiff's claims .... Additionally, the quantum of proof required to establish the allegations of the original complaint would fall far short of the proof required to support [the defendant's] claims"); *Blue Dane Simmental Corp. v. American Simmental Ass'n*, 952 F.Supp. 1399, 1408—1409 (D.Neb.1997)(refusing to find state law claims compulsory counterclaims because they would require the court to address a great deal of additional law and evidence and because "the counterclaims require examination of the conduct of six parties who have no apparent involvement in the main claim").

The Seventh Circuit Court of Appeals once observed that "this circuit's formulation of the 'logical relationship' test has been described (and praised) as a 'narrow one[.]'" *Colonial Penn*, 31 F.3d at 448. As the court is of the firm belief that Rule 13(a)'s goal of judicial economy would be greatly disserved if the court were to address issues irrevocably set to be addressed in another court, and as Rule 13(a) was "designed to balance the interest of the counterclaimant in prosecuting the counterclaim in a forum of its own choosing against the interest in conserving judicial resources[,]" 3 James W. Moore, Moore's Federal Practice, § 13.10[2][b] (Daniel R. Coquillette, *et al.*, eds., 3d ed.2001)(citing *Burlington Northern*, 907 F.2d at 710)—two interests that both tip toward allowing MuscleTech to pursue its claims in the Western District of New York—the court will refrain from employing a pointlessly broad conception of compulsory counterclaims to stand in its way. The court finds MuscleTech's claims in the

New York action not to be compulsory counterclaims here. *Cf. Southern Constr.*, 371 U.S. at 60, 83 S.Ct. 108 (refusing to deem claims compulsory counterclaims because doing so would not serve the purposes of the compulsory counterclaim rule).

■ The court wishes to be very clear, however, that this determination that MuscleTech's claims are not compulsory counterclaims is firmly grounded in an application of the logical relationship test, and not in any exception to the compulsory counterclaim rule that may exist in Federal Rule of Civil Procedure 13(a). MuscleTech argued in its filings that the claims it brought against Super Natural in New York were not "vested" at the time it filed its answer in the present case, and (in possible contradiction to the first argument) that those claims were the subject of an already-pending action at the time Super Natural brought its suit in this court. Either of these arguments—if they had merit—would take MuscleTech's claims out of Rule 13(a) entirely.

MuscleTech began its argument on Rule 13's exceptions by noting that the rule specifically excludes potential counterclaims a defendant did not "have" at the time the responsive pleading in the first action was filed. *See* Fed.R.Civ.P. 13(a); *Burlington Northern,* 907 F.2d at 710. It then claimed that because it did not know all the details of Super Natural's dealings with M Olympus until discovery was taken in the present case, that it did not "have" mature claims against Super Natural until sometime after it filed its answer. The cases MuscleTech cited in its brief fail to support this position, however. In *Bur-*

*lington Northern,* for example, the claims sought to be asserted in a later action were for recoupment of expenses from the first lawsuit (to which the plaintiff was entitled under a contract unrelated to the initial suit). *See* 907 F.2d at 709. Quite obviously, these claims did not become viable until the expenses were actually incurred in the first suit. That is not the situation here. In *Patrick v. Femco Southeast, Inc.,* 590 So.2d 259 (Ala.1991), another case cited by MuscleTech, the defendant was completely unaware of the possibility that it might have a claim against the plaintiff until after evidence to that effect emerged at a deposition. That is not the situation here, either.

In the present case, MuscleTech was fully aware of the fact it had a potential counterfeiting claim against Super Natural well before it served its answer in this case. In fact, MuscleTech was so certain that Super Natural had participated in the alleged counterfeiting ring by October 12, 2000, that it was willing to impose on Super Natural the not-insubstantial economic burden of losing access to a product line that generated nearly 20% of the distributor's cash flow. One company would not consciously disrupt an on-going business relationship in this manner, especially when the victim was a valued partner, unless it was certain of its position. The fact that MuscleTech did not know all the "details" of Super Natural's alleged wrongdoing is immaterial. In the typical lawsuit, one sues when one knows he or she has been wronged; the details of that wrong do not become crystalized until discovery. MuscleTech knew it had been wronged by at least November 6, 2000, when it filed its answer in this case.[4] Its

4. MuscleTech suggests that its claims were not mature by November 6 because it did not know at that time that Super Natural's actions were "wilful," an element of the RICO claims eventually filed against Super Natural. This argument is belied by the fact Muscle-

Tech's October 12, 2000, termination notice stated Super Natural "knew or should have known" that the goods coming from M Olympus were counterfeit. Furthermore, MuscleTech's November 8, 2000, answer alleges that

claims against Super Natural were fully mature at that juncture.

■ MuscleTech's next argument regarding Rule 13 exceptions is that its claims against Super Natural are not governed by the rule because they were the subject of another pending litigation—the New York action—at the time Super Natural filed its lawsuit. *See* Fed.R.Civ.P. 13(a); *Brach v. Amoco Oil Co.*, 677 F.2d 1213, 1226 (7th Cir.1982). It is beyond dispute, however, that MuscleTech did not add Super Natural to the New York action until January 29, 2001—three months *after* Super Natural sought protection in the Waukesha County Circuit Court. Muscle-Tech apparently would like the court to relate its January 29, 2001, claims back to August 28, 2000 (the date of its initial complaint), for the purposes of the "already pending" exception to Rule 13(a). MuscleTech cites absolutely no case authority to support this sort of manipulation, though. The two cases MuscleTech does cite, *St. Paul Fire and Marine Ins. Co. v. Seafare Corp.*, 831 F.2d 57 (4th Cir.1987), and *Brach v. Amoco Oil Co.*, 677 F.2d 1213 (7th Cir.1982), are clearly inapposite in that those cases dealt with situations where prior *claims* existed, not just prior lawsuits. In the one case discovered by the court that does address a situation where a party was added to an already-existing lawsuit *after* the filing of a second lawsuit asserting possibly compulsory counterclaims, the court looked to the date of joinder (and thus assertion of "claims") as the operative date for the purposes of Rule 13(a), not the date the first lawsuit was filed. *See Abercrombie v. Lum's, Inc.,* 531 F.2d 775 (5th Cir.1976). Thus, the "already-pending" exception to the compulsory counterclaim rule is unavailable to MuscleTech.

■ Of course, the above discussion of Rule 13 exceptions is largely irrelevant to the current motion in that the court has determined that MuscleTech's claims in the New York action were not compulsory counterclaims here at all. In the same spirit of completeness that animated that discussion, however, the court wishes to make one other arguably moot point perfectly clear: Even if the court did find MuscleTech's claims compulsory, it would not enjoin their prosecution in New York.

As the Seventh Circuit Court of Appeals has instructed, the court's discretionary power to enjoin prosecution of compulsory counterclaims in foreign jurisdictions is to be exercised with due regard to convenience and, by implication, the policies that underlie Rule 13. *See Asset Allocation,* 892 F.2d at 573. The considerations most relevant to the court's determination are economy, fairness, and consistency. *See* 3 James W. Moore, Moore's Federal Practice § 13.10[1][b] (Daniel R. Coquillette, *et al.,* eds., 3d ed.2001)(policies underlying the compulsory counterclaim rule are economy, fairness, and consistency).

In light of the foregoing analysis, the court believes judicial economy would be greatly disserved by the entrance of an injunction. Moreover, fairness and consistency would be equally sacrificed in the name of one party's preferences if the court were to preclude MuscleTech from

Super Natural had "unclean hands"—a defense that requires wilful misbehavior by the plaintiff. *See Harnischfeger Corp. v. Superior Crane Corp.,* Bus. Franchise Guide (CCH) ¶ 10,618 at 26, 478 (E.D.Wis.1995). This argument, then, seems to be flatly contradicted by MuscleTech's own previous filings in this case, as well as by the testimony of its witness

Terry Begley at the January 12, 2001 preliminary injunction hearing. *See* Hearing Trans., p. 98 ("if I did believe [on September 18, 2000, that Ms. Calvy was not a wilful participant in the alleged conspiracy], would I be tape-recording the conversation because I believed she was going to lie about it later?").

pursuing its claims against Super Natural in the Western District of New York.

To be sure, no matter how serious Super Natural's accusations in the present lawsuit may be, this case is but a sideshow to the much more wide-ranging action in New York. The real dispute between the parties is not over whether Super Natural was a "dealer," or whether MuscleTech may have offered an improper one-time discount to a distributor in Chicago, but over whether MuscleTech was the victim of a counterfeiting scheme and whether Super Natural was a participant.

To force MuscleTech to present all its evidence of wrongdoing in both New York (where it long ago brought claims against numerous alleged parties to the counterfeiting scheme) *and* Milwaukee (as would be required if the court were to bar prosecution of claims against Super Natural elsewhere) would be to place an undeniable burden on that company. When one considers that Super Natural likely will have to litigate in New York anyway due to the cross claims that have been filed against it, this burden begins to appear genuinely unfair. Furthermore, were this court and the New York court to address the counterfeiting allegations independently, there would be a very real risk of inconsistent judgments. Thus, considerations of judicial economy, fairness, and consistency all mitigate against entering the injunction sought by Super Natural.

Perhaps it was for similar reasons that the Seventh Circuit in *Asset Allocation* suggested that discretionary injunctions should not be issued to bar prosecution of subsequently filed claims where the previously-filed lawsuit is but a "sideshow" to the second—even when the latter-filed claims *are* properly characterizable as compulsory counterclaims. *See* 892 F.2d at 573. Taking the Court of Appeal's suggestion, then, the court would have denied Super Natural's motion even if its determination of the compulsory counterclaim issue would have turned out differently.

**CONCLUSION**

Federal Rule of Civil Procedure 13(a), enacted to facilitate efficient adjudication of related claims, requires a party to file in its responsive pleading all "compulsory counterclaims" that party may have against another litigant. One determines if claims are compulsory counterclaims by determining if they are "logically related," an examination that requires consideration of the "totality of the claims" and judicial economy. The claims MuscleTech has filed against Super Natural in the Western District of New York go far beyond the scope of the claim filed by Super Natural in this court and would require a great deal of additional—and duplicative—effort to resolve here. As such, they are not compulsory counterclaims in the present lawsuit. This is not to suggest that MuscleTech has qualified for an exception to Rule 13(a); Rule 13(a) simply does not apply in this case. Even if it were to apply, however, the court would not exercise its discretion to enjoin MuscleTech from pursuing its claims in New York. To do so would waste judicial resources, impose an unfair burden upon MuscleTech, and create the risk of inconsistent judgments.

Accordingly,

**IT IS ORDERED** that Super Natural's motion to enjoin prosecution in another court of a claim that is a compulsory counterclaim in the present action be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that MuscleTech's alternative motion to transfer venue pursuant to 28 U.S.C. § 1404(a) be and the same is hereby **DENIED** as moot.